May it please the Court, Counsel, Bruce Campbell on behalf of the appellant, Coast Seafoods. With the Court's permission, I'd like to reserve four minutes for rebuttal. Just keep track. It counts down. Thank you. This case involves the question whether Coast's oyster-growing facility in Washington is deemed to be a point source and is therefore required to obtain an NPDES permit. There are really three dimensions to this question. The first is can the oyster facility be deemed to be a point source, as that term is defined under Section 1362, sub 14 of the Clean Water Act. Second is do the EPA's point source regulations require Coast to obtain an NPDES permit? And third, does this Court's decision in Affedi foreclose Ofco's argument that Coast is required to obtain an NPDES permit? Beginning with the text of the statute, because this is a statute that is ‑‑ involves an agency's interpretation of a statute that it administers, the Supreme Court's case in Chevron provides the framework by which this Court is to construe the statute. And that is the Court, to the extent the statute has any ambiguity, the Court is to give deference to the agency's interpretation, provided that the agency's interpretation is reasonable. And here the question, the specific question is really, is the inclusion of a CAFO, or Concentrated Animal Feeding Operation, in the point source definition an additional means of creating a point source, or is it the sole means of creating a point source? So why don't we start with the statute? Why don't we read sub section 14? Okay, let's take a look at that. Sub 14 defines a point source as any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete, fissure, container, rolling stock, concentrated animal feeding operation, or vessel, or other floating craft. Okay, don't go so fast over that. Okay, we've got an earlier part, we've got pipes, ditch, channels, tunnels, and so on. And then we have concentrated animal feeding operation. Okay, got it. Or vessel or other floating craft from which pollutants may or are, may be or are discharged. Yeah. Now, I think the easiest way to interpret the statute is to break it into its component pieces, and you can dissect it really into two pieces. The first is really the actual definition, and that is a discernible, confined, and discrete conveyance from which pollutants are or may be discharged. The second, then, is the list of illustrative examples, pipe, ditch, channel, tunnel, conduit, well, et cetera, including CAFO. And when you look at it, the inclusion of a CAFO is somewhat of an anomaly in the statute. Right. Because unlike everything else in the statute, these are all discrete conveyances. They're very narrow things, a pipe, a ditch, a tunnel, a channel. But a CAFO describes an entire operation. So we're left with a question of what did Congress intend? Can we tell from the statute, from the text of the statute itself, what Congress intended? And I would submit the answer is no. And the reason is, is because a CAFO doesn't really, if you, in order to give effect to the CAFO, the inclusion of a CAFO in the point source definition, you have to say that the CAFO is the sole means by which an animal feeding operation could be deemed to be a point source. Well, now, how do you get there? And that may be the key to your argument, that you say it's the sole means. Well, what if it is both a concentrated animal feeding operation and it has pipes, ditches, and so on? Well, Your Honor, I would submit initially that that's the precise issue that Affetti dealt with in the context of what we have here, which is a concentrated aquatic animal production facility, or a CAPF. And Affetti said if you have an aquatic animal production facility that does not meet the threshold for a CAPF, then it is not required to obtain, it's not a point source, it's just not required to obtain an NPDES permit. And the Court makes it very clear. Now, Ofco goes to great lengths in its brief to say, well, Affetti is really distinguishable because it talks about a muscle raft, and a muscle raft is not the same as a ditch, a channel, or a tunnel, or other conveyance that they've alleged that the Coast Oyster Facility has. But I think that's a distinction here without a difference, because in Affetti, this Court assumed that the muscle raft could otherwise be characterized as a point source, and the Court said it doesn't matter. It's at 299F3rd at page 1218. The Court said in rejecting Affetti's argument that the... 1218? Wait a minute. No, you and I are not on the same page. Oh, I'm sorry, 1018. 1018, yeah, okay. So where are you on 1018? It's the language where the Court says whatever merit this argument might have in the absence of a regulatory definition, right there. Okay, I'm sorry. I'm on 1018. What column are you in? I'm slow here, so. Unfortunately, I don't have the Westlaw printout, so it's a paragraph that begins, it says, Affetti argues that he... Okay, I'm with that paragraph. I got you. Okay. Okay, so Affetti, it goes on, it begins by saying, Affetti argues that even if Taylor's muscle harvesting facility does not meet the EPA's definition of a CAF, they still meet the general definition, discernible, confined, and discrete conveyance, or under the more specific definition, vessel or other floating craft. By this reasoning, Affetti argues that Taylor's muscle rafts are point sources and that their operation, if discharging pollutants, require an NPDES permit. And this is the important language. This Court says whatever merit that argument might have in the absence of a regulatory definition of what, when an aquatic animal feeding operation is a point source, the argument has little persuasive effect when faced with aquatic animal farming that does not involve the feeding and is not within the expressed and described limits that invoke the Act under this regulation. So Affetti is on all fours with this case. It is indistinguishable. It involves muscles, not oysters, but... And it involves no pipes, no, I mean, it's just a raft from which the muscles are suspended. Your Honor, but in Affetti, the Court says, we accept for the sake of argument that this muscle raft could otherwise be deemed to be a point source, but in the context of aquatic animal farming, it doesn't matter. Well, but as I read Affetti, the only possible basis for construing this as a point source is that it's a concentrated animal feeding operation, and then we have a regulation that defines what qualifies as a point source as a concentrated animal feeding operation, and the regulation doesn't include the muscle, muscle raft. End of story. It does not involve the question where it may at the same time be a concentrated feeding operation and have pipes, conveyances, and so on. So it doesn't speak to the question that we have here. Your Honor, I would directly disagree with that assertion. I think Affetti makes very clear that the Court looked at whether or not this is an aquatic animal production facility. Step one, does it meet the production and feeding thresholds to qualify as a concentrated aquatic animal production facility, or is it a significant contributor of pollutants to the waters of the United States? The Court found, no, it does not. So therefore, it cannot be regulated as a point source under the CAPF criteria. Then Affetti, the plaintiff, which is like Ofco in this case, said, Aha, okay, you're not a point source under the CAPF criteria, but you can otherwise be a point source because a muscle raft is a discernible, confined, and discrete conveyance from which pollutants may be or are discharged. And Taylor, the plaintiff, said there's two ways you can make that argument. One is that a muscle raft is a floating – comes under the specific definition of a – it's a vessel or a floating craft, or it is otherwise a discernible, confined, and discrete conveyance. But the conveyance argument just seems to me a total nonstarter. What's being conveyed? The argument was made. It's right here in the opinion. And Affetti argues that given Taylor's muscle harvesting facilities, they meet the definition of the CAPF criteria or fall into the general definition. So it's either one of the – it's either a raft or it's a discrete or discernible, discrete, and confined conveyance. And the Court said, lookit, whatever argument or whatever merit that might have, it doesn't apply – it doesn't apply here where you have a regulatory scheme for aquatic animal production facilities. So the Court – that argument was specifically raised and specifically rejected by this Court in Affetti. It's right there at 1018 and 1019. The Court goes on to say that in the context of aquatic animal harvesting, the EPA regulations expressly exclude from the definition of point source facilities like Taylor's that do not meet the certain feeding thresholds. To hold that these facilities are nonetheless point sources under the statutory definition would render the EPA's CAPF criteria superfluous and undermine the agency's interpretation of the Clean Water Act. But I just can't get away from the fact of Affetti that what you have is a raft, a stationary raft from which muscles are suspended. It's a very common – of course, I'm sure you know as well as I do – method of shellfish farming. Many oysters are farmed in the same way. Once they're out on the water, they're suspended. There are no pipes. There's no discharges from pipes. That part of point source simply is not at issue and was not at issue in Affetti. Your Honor, it wasn't pipes and ditches, but it was – the point source definition was squarely at issue, a discernible – Well, that's a very good question. I think that's a very good question. And then we had a regulation that defined what qualified, and it didn't qualify under the regulation. Your Honor, this Court, Judge Gould writing for the Court joined by Judge Graber and Chief Judge Thomas, wrote that whatever this – whatever Taylor's argument might have in the absence of a regulatory definition of a cap, it doesn't fly here because you have the – it would supplant the entire regulatory scheme. This Court assumed that the muscle rafts were otherwise a point source. Well, as I read that language, what they're saying is that the regulation narrows the permissible or operational scope of the statute, which the EPA from time to time does. It will occasionally, as it were – maybe I shouldn't say it this way, but reads out of the statute the full scope of the permissible operation of, for example, the concentrated animal feeding operation. They define it more narrowly than the statute seems on its face to do. So when they say in the absence of the regulation, we might read the statute more broadly, but we're reading the regulation, but it's a regulation that applies specifically to the concentrated animal feeding operation. Correct, and that's exactly – that's precisely the case that we have here. But that doesn't speak in the least to an operation that has conveyances such as pipes and so on. That's simply not at issue in Confetti, in the case. Your Honor, that's precisely the case that we have here. It's the conveyance, whether it's a pipe ditch or a muscle raft or something else. But a muscle raft is not a conveyance. That's not the basis on which it is being regulated. But Taylor's argument was, notwithstanding the regulation, you can still say it's a point source because it has – a raft is otherwise a discrete conveyance. And the Court said, let's accept that as true for the moment. It still doesn't work because you have this – you have this complex statutory or regulatory scheme. And under the regulatory scheme, it's not a conveyance or it's not a – it's not a concentrated aquatic animal production facility, and therefore – You're trying to save some time. No. Thank you, Your Honor. Yeah. Let's hear from the other side, and we'll make sure you get a chance to say what you need to say. Thank you. Good morning, Your Honors. May it please the Court. I'm Paul Kampmeyer for Plaintiff-Appellee Olympic Forest Coalition, and I have three points I'd like to make today. First, this case must be decided for appellee at Chevron Step 1 because the statute is unambiguous in requiring permits for pipes, ditches, channels, and CAFOs. Second, that reading of the statute does not render the term CAFO superfluous, as Coast argues. Third, the Forrest-Grenn and Brown decisions establish that the statutory definition of point source controls if it clearly encompasses the conveyances at issue. And the Brown case clearly held that pipes, ditches, and channels are point sources that require permits. The Ifeti decision is not to the contrary. Before getting to these legal arguments, I want to note that this case is about a land-based facility that uses pipes, ditches, and channels to discharge chlorine and ammonia and other pollutants to Quail Seen Bay in Puget Sound. For the Court's reference, I included a picture of the facility in my brief. It's at page 8. Also, excerpts of record, page 18. I don't want to quibble, but I think you're over at the top of Hood Canal. You're not in the Sound. Is that right? I think of Hood Canal as being part of Puget Sound, but, yes, it's on Hood Canal. You're over on the top of Debaugh Bay, as I recall. Yes. Yes, Your Honor. That's right. Forgive me. So the question, looking at the picture, is whether the pipes and ditches at Coast facility require a permit or whether Coast can continue discharging to Quail Seen Bay without limit or oversight. So to my first point, this Court must affirm the denial of Coast's motion to dismiss because the statute clearly prohibits the discharge of pollutants from pipes, ditches, channels, and CAFOs. Coast is wrong when it asserts the statute is ambiguous regarding whether the term CAFO is the sole basis or just one of many bases for requiring Coast to have a permit. Section 301A of the Act prohibits the discharge of any pollutant by any person. And the Act defines the term discharge of a pollutant to mean, quote, any addition of any pollutant to navigable waters from any point source. By prohibiting any addition of pollutants from any point source, Sections 301A and 502.12 unambiguously prohibit pollutant discharges from any one of the point sources listed in the statute. In doing so, those sections directly address and clearly answer the question presented, whether CAFO is the sole basis for permitting a facility that feeds animals. It plainly is not. Just because a facility isn't a CAFO doesn't mean it's not a point source. It just means it doesn't require a permit by virtue of being a CAFO. In other words, CAFO is one but not the only basis for regulating a facility that feeds animals. You know, this sounds like the logic part of the test of the LSAT. Forgive me. Forgive me. Forgive me. No, no, it's not. It's not your fault. I mean, that's what this case is. I'm starting with the statute and I'm trying to read the statute plainly. It's not your fault. I'm just characterizing the nature of the analytic problem we have in front of us. And occasionally the LSAT actually tests things that are legally relevant. So I know you're going to talk about a FETI hopefully in a moment, but the argument you're making sounds like the argument that your opponent says was made in a FETI, that even if they're not a CAFO, they are a point source under the definition and therefore need a permit. Why is that not a fair reading of a FETI? It is a fair reading. And on the point source issue, I believe that a FETI was correctly decided. But as I explained in our brief, this case is materially different. So what I believe that Mr. Campbell is incorrect in his point that he made in his reply brief, that a FETI assumed there was a point source, but held anyway that because the facility didn't meet the aquatic animal production facility rule criteria, that it was exempt even though it was discharging from a point source. But that ---- I think one reading, you know, and this is what I guess we have to decide in this case is how to read a FETI. But I think one reading of a FETI is that they will assume for purposes of argument that the muscle raft is a vessel or other floating craft, which is one of the enumerated point sources in the statute. And so if we assume that, but it's still ---- and it's not a CAFO, then why would it not require a permit? Because that's not what the Court did. What the Court did is it looked at the arguments that a FETI was making. A FETI claimed it may not meet the CAPS criteria, but it's either a vessel or a floating craft, or it fits into discernible, confined, and discrete conveyance. And the Court looked at that and said, no, this isn't a vessel or floating craft. It doesn't fit there. And we're not going to say that it fits into discernible, confined, and discrete conveyance, because that term is ambiguous and there's a specific regulation on point. So the Court in a FETI essentially said, we don't think that these muscle rafts, which are anchored to the seafloor, not used for navigation, surrounded by netting, these don't fit into a Chevron Step 1 analysis because there's no precise term here that captures this pollution source. So we're going to go to Chevron Step 2. We're going to look at the CAPS criteria, which is the rule on point. We're going to see that this facility doesn't meet the feeding and production thresholds, and so we're going to defer to EPA's determination that this facility is not a point source that requires a permit. So the difference in this case is that we have pipe stitches and channels. Please look at ER at my brief at page 8 or ER 18. There's pipe stitches and channels. We have — I think that's pretty clear. Right. Right. And so because the statute says in 502.12 the discharge of any pollutant from any point source requires a permit, one has to look at the whole list and see do the conveyances in question fit into any category in the list. And here they do. They fit into pipes. They fit into ditches. And they fit into channels. And because the statutory definition of point source says any pipe, any ditch, any channel, that means that even pipe stitches and channels at oyster hatcheries that don't meet the CAPS criteria are point sources that require a permit. The two other cases that came after AFETI, Legal Wilderness Defenders v. Forsgren and Northwest Environmental Defense Center v. Brown, both confirm this. Forsgren establishes that the statutory definition of point source is the touchstone for deciding whether something is a point source. And if the statute clearly encompasses the conveyance at issue, we look to the statute. It's a point source. And we don't look to EPA regulations that might undermine those clear categories. Northwest Environmental Defense Center v. Brown then followed that and said pipe stitches and channels are clearly captured by the statutory definition of point source. So we have a Ninth Circuit case that's right on point that says pipe stitches and channels are point sources. And AFETI, Forsgren and Brown are Chevron Step 1 cases. AFETI is a Chevron Step 2 case where the statute didn't clearly encompass the point sources at issue, and so they look to EPA regulations. Okay. I want to ‑‑ I think I covered the statutory definition of point source in my paper, so I won't explain further on that point. But I do want to emphasize and especially point the Court's attention to the Alley case that talks about the importance and the breadth of the word any. Where the statutory definition of point source says any pipe, ditch, or channel, and where it includes an express limitation on point source for agricultural stormwater discharges but says nothing about oyster hatcheries, it's clear that the pipe stitches and channels here are within the statutory definition of point source and so require a permit. I want to turn to a point that Mr. Campbell made, and in particular he emphasized this in reply. He says if we construe the statute this way, if we construe 301A, 502.12, and 502.14, to mean that all pipes, all ditches, all channels, and all CAFOs require permits, we're somehow rendering the term CAFO superfluous. Here's why that's wrong. First, there's no support in the record whatsoever, factual support or legal support, for Coast's claim that all CAFOs collect and channel pollution before discharging to surface waters. His point is that, hey, look, all these CAFOs collect and channel through pipes and ditches, and so CAFO is superfluous if you can also regulate these facilities through pipes and ditches. That's wrong. Well, at least it's not demonstrated in the record. There's no factual evidence and there's no legal case law for the premise of his argument. In fact, and we cited cases at pages 33 and 34 of our brief, quite the contrary is true. Animal feeding operations generally do not discharge from pipes, ditches, and channels. Instead, they store animal waste in lagoons and then apply it to agricultural fields. This is what Congress was trying to get at when Congress added the term CAFO to the statutory definition of point source. Coast's argument defies common sense. Coast would have this Court hold that by adding the term CAFO to point source, by broadening the reach of the statutory definition of point source and hence the NPDES permit program, Congress actually intended to quietly limit the reach of the phrase any pipe, ditch, or channel. That's what Coast wants this Court to hold, that Congress intended quietly to exempt pipe, ditches, and channels at CAFOs when they added the term CAFO to the point source definition. But that's not what the statute says. That's not what 502.12 says, and it's not what 502.14 says, the statutory definition of point source. Two other quick points. Coast's argument, their superfluous argument also fails because none of the five cases that it cites support its cause. Three of the cases, Greater Yellowstone, Environmental Defense Center, and Hibbs v. Winn are not about CAFOs at all. And the other two cases that are about CAFOs, the CARE case and the Southview Farms case, do not support Coast's statutory argument at all, and they do nothing to suggest that the inclusion of CAFO is superfluous if it's not the sole basis for regulating an animal feeding operation. So finally, the term CAFO and its implementing regulations clearly have utility in this context. For example, in our papers, we cited the salmon net pen cases from Maine. These are facilities that are out in the water. In contrast to our facility here, they have great nets, again, anchored to the seafloor, and they house thousands, hundreds of thousands of salmon, of fish. They're, so far as I know, are no discernible confined and discrete conveyance, but given the size and the intensity of the facility, EPA has said, we're going to deem these to be point sources under our aquatic facility rule. And so it absolutely gathers in and regulates pollution sources that aren't otherwise captured by the traditional statutory definition of point source. Have you looked to see if there is any legislative history that's relevant to this issue? I did not look deeply at that because I didn't think that Coast Seafoods presented an argument that required looking behind this to the legislative history. We did cite the cases at pages 33 and 34 of our brief. The Southview Farm case, the Koopman Dairy case, the Bozema Dairy case, and each of those, at some level, goes into, you know, what's the pollution source here and what did Congress intend? And I think it's clear, I think there was a statement from Senator Dole, that the concern was that we were having an oversaturation of the soils to the point where these farm fields could no longer accommodate, absorb all the pollutants, the manure that was being added to these fields. And so we were getting runoff into streams and creeks that was becoming a pretty serious pollution problem. And so I believe Congress said, we're going to regulate the entire facility. There may not be a pipe ditcher channel. Sometimes there are, as in the Southview case. But we're going to regulate this to make sure that these concentrated feedlots are deemed to be point sources and so brought into the NPDES permit program. And, of course, that makes sense because under the Clean Water Act, they've had terrible trouble deciding what to do with runoff that is simply unchanneled runoff. So if it's a feedlot that produces runoff that's not channeled, how are they going to get to it? Well, this is the way they did it. I think that's absolutely right. So my time is running out here. I would just like to say one more, maybe two more points. The first is we made extensive arguments in our papers about the meaning of the regulations. I'm going to rely on our papers for those arguments except to say that those regulations mimic the statute and that the regulation Mr. Campbell points to doesn't include any express language exempting anything. It brings certain sources into the permit program, but it does not exempt anything. And with that, I see my time is done. I'll sit down. Roberts. Okay. Thank you. Thank you, Your Honors. Mr. Campbell. Thank you. Let's go right to Affetti, Your Honor. Counsel said that Affetti said that the mussel rafts were not a floating craft or so they're not point sources. Counsel also said that the Court said that the mussel raft, it's not clear whether it's a discernible, discrete, or conveyance. I've read Affetti a hundred times. There's nothing in the opinion to that effect, nothing whatsoever. That's what counsel wishes it would say, but it doesn't say that. And if the Court wants to, I think this is an important point, because what counsel is really asking is that the Court overrule Affetti, because Affetti assumes, and it's very clear in the language, that the mussel rafts here, they talk about Taylor's argument and they say, we assume for the sake of argument that that's correct, but it doesn't matter. Whatever merit this argument might have in the absence of a regulatory definition, the argument has little effect when faced with aquatic animal farming. You just paraphrased that as saying we're assuming the argument is correct. Well, no, they didn't say that. They wrote whatever argument, whatever merit the argument might have. That's different from saying we assume that it's correct. Okay. They say whatever merit the argument might have, it has little persuasive effect when you have a regulatory scheme like that for caps and cafos. Right, right, right. No, I get that. But Affetti is far from saying that the argument is a good argument. It says whatever effect, whatever merit the argument might have. So in other words, assuming arguendo, that so that's what Affetti says. And I think the effect of their argument is to ask the Court to overrule Affetti with respect to the argument that cafos. Let me come back to this. Overrule Affetti, what? There's no holding in Affetti that that's a good argument. The holding in Affetti, Your Honor, is that no the holding in Affetti is when you have a regulatory scheme like that that governs cafos and caps, whether or not something can be otherwise defined as a point source is irrelevant, because the point source determination — I don't read — I guess we disagree. I don't read Affetti as holding that. Well, I realize I may be beating a dead horse, Your Honor, but I think that's the square holding of Affetti. As far as — and I think Affetti is rightly decided. When you go back to the statutory definition, the argument the counsel makes is, well, cafos don't necessarily discharge water. But if you look at this Court's decision in Yellowstone Coal, it said the essence of a point source is something that collects and channels water. So they're arguing for an irrational result. They're saying a cafo, even though a point source is something, a discrete and combined conveyance that discharges water, they said a cafo doesn't do that, but yet it's found in the definition. And that's the ambiguity, and that's the gap that Congress left the EPA to fill. Okay. Thank you very much. Thank you, Your Honor. Thank both sides for your helpful arguments. Olympic Forest Coalition v. Coast Seafood Company submitted for decision. That's the last case this morning, and we're now adjourned. Thank you.
judges: Fernandez, W. Fletcher, Melloy